PAPPIN, ET AL., RESPONDENTS, v. DUDLEY, ET AL.,
APPELLANTS.
No. 9035.
Submitted April 24, 1951.   Decided July 24, 1951.
236 Pac. (2d) 280.

Messrs. Graybill and Bradford, Mr. Marvin J. Smith, and Messrs. Bjornlie and Baucus, all of Great Falls, for appellant.

Mr. H. R. Eickemeyer, and Mr. William F. Browning, Great Falls, for respondent.

Mr. Conrad T. Bjornlie, Mr. Leo C. Graybill, Mr. William F. Browning and Mr. H. R. Eickemeyer argued orally.

MR. JUSTICE METCALF:

The Victory Construction Company was a partnership formed by Floyd Pappin, Joseph C. Karaffa, John H. Humphrey, Roy Anderson and Fred B. Dudley for the purpose of bidding for and performing certain construction work at the Great Falls Air Field, Great Falls, Montana.

The written partnership agreement provided that each partner should have an equal share in the co-partnership and in its proceeds, and that at the completion of the work for which the partnership was formed the assets of the partnership, including money and equipment owned by it, should be distributed equally among the parties, share and share alike.

The Victory Construction Company was the successful bidder and the construction work was performed and completed by the end of the year 1942. In April of 1943 under the provisions of 56 Stat. 245, as amended, 50 U. S. C. A. Appendix, sec. 1191, negotiations were commenced with representatives of the War Department for a renegotiation of the excess profits of the partnership.

Mr. Palmer Johnson, attorney at law, and C. P. A., who had been employed previously as the auditor of the partnership, was retained as counsel and tax adviser to work with the Army officers and represent the partnership in the renegotiation proceedings. His final report showed that the renegotiation cost to the partnership was $35,000. However, under the agreement with the United States government the renegotiation cost was given as $26,500 which was paid by the partnership. The $8,500 which was the difference between the $35,000 reported and the $26,500 actually paid to the government was paid to defendants Dudley and Anderson, Anderson receiving a check in the amount of $4,800 and Dudley a check in the amount of $3,700.

This action by the plaintiff partners, Pappin, Karaffa, and the heirs of Humphrey, deceased, is for an accounting of the payment of $8,500 paid to the two defendant partners and for a repayment of that amount into the partnership funds and a division of it in accordance with the partnership contract.

The trial court found that the renegotiation refund was unequally charged against the partners and that the defendants should repay $8,500 to the partnership which should be distributed in accordance with the partnership agreement.

The first meeting with the Army officers representing the War Department for renegotiation was held in Spokane on April 29, 1943. Subsequent meetings were held in Great Falls before the final renegotiation contract was agreed upon. The passage of the Current Tax Payment Act of 1943, sometimes called the Ruml Tax Foregiveness Plan, 57 Stat. 126, 26 U. S. C. A. Int. Rev. Acts, page 385, on June 9, 1943, added a factor to the renegotiation proceedings that was not originally contemplated by the

partners but had to be taken into consideration to make an equit-able agreement.

The Army officers representing the United States government originally fixed the sum of $50,000 as the excessive profits refund from the Victory Construction Company. Later the figure was reduced to $45,000. Finally at a meeting in Great Falls on August 10, 1943, at which the two Army officers representing the United States government, Mr. Pappin, Mr. Karaffa, Mr. Anderson, Mr. Dudley and attorney Palmer Johnson were present, a renegotiation refund of $35,000 was arrived at. The $35,-000 figure was based upon a parol agreement between the partners and the Army officers that the tax refunds for each of the partners upon the income tax already paid could be secured. This agreement was designated "gentlemen's agreement" and is so referred to throughout the record.

Prior to the passage of the Ruml Plan the tax refunds of the partners could have been made as a part of the renegotiation agreement under the provisions of I. T. 3577 (1942, 2 Cum. Bull. 163) and 26 U. S. C. A. sec. 3806, 56 Stat. 798. Therein the Internal Revenue Department stated by directive and Congress adopted by statute the policy that when a reduced contract price must be retroactively applied to a prior taxable year in which a return had been filed and tax paid, the amount of the taxes paid should be credited against the excess profits and the renegotiation figure reduced by that amount, so that the refund as a result of the renegotiation would be only of the excessive profits over and above the federal taxes assessed thereon. There would then be no refund for taxes paid or assessed on that prior taxable year. Paragraph 4, subdivision 8, Principles, Policies and Procedures to be Followed in Renegotiation, issued by the War Department Price Adjustment Board, dated August 10, 1942, declared that in renegotiating in a prior fiscal year where the return of excessive profits takes the form of a refund, taxes previously assessed and paid on the excessive profits should be taken into consideration. But the Current Tax Payment Act of 1943 raised a new question. That Act provided that the income

tax of each individual for the taxable year of 1942 was forgiven as of September 1, 1943. To some extent the tax for the taxable year for 1943 was based upon income for the taxable year of 1942 but nevertheless the tax was assessed for 1943 and not for 1942. When the income tax for any individual for the taxable year of 1943 was greater than the income tax for the taxable year 1942, then the tax on 1943 income was substantially the tax to be paid plus 25 % of the tax on the income for 1942, computed at the rates provided in the Internal Revenue Code. However, if the income tax for the taxable year 1942 was greater than the income tax for the taxable year 1943, then the 1942 tax was substantially the tax plus 25 % of the tax based on the income for the taxable year 1943. All payments made on the 1942 assessment which were forgiven were applied on account of the 1943 tax.

Therefore, under the Ruml Plan, because the tax for the year 1942 was forgiven, where an individual renegotiated for the year 1942, he would be entitled to no tax credit under either section 3806 or I. T. 3577. In order to clarify the matter the Bureau of Internal Revenue issued I. T. 3619 (1943 Cum. Bull. 981). Substantially it provided that where a retroactive price reduction is made as a result of renegotiation to affect income for work performed in the year 1942, no tax credit under section 3806 of the Internal Revenue Code is allowed since the liability for the year 1942 becomes discharged as of September 1, 1943, and since payments on account of the tax are considered as payments for the taxable year 1943. A taxpayer in estimating his tax for 1943 and filing his 1943 return may eliminate from his 1942 income the excessive profits refunded or agreed to be refunded.

The problem was further complicated by the fact that these partners were on a different tax basis as a result of income received from sources other than the Victory Construction Company. The three plaintiffs, Pappin, Karaffa and Humphrey, had an estimated income for the year 1942 greater than their income for 1943. Therefore, under the provisions of I. T. 3619

they would be able to receive all the tax benefits allowed them by the Current Tax Payment Act.

The defendants, Dudley and Anderson, estimated that their tax would be greater for the year 1943 and therefore they could not recover the full amount, but would only recover one-fourth of the 1942 tax and therefore only one-fourth of the income tax paid on the excessive profits refunded.

These matters were discussed in the August meeting between Mr. Johnson, the partners and the officers representing the United States government, and the so-called gentlemen's agreement was that a plan should be worked out so that each of the partners would be able to receive his tax credits. The evidence as to the effect of this gentlemen's agreement is in conflict. The plaintiffs contend that the Victory Construction Company would pay $7,000 for each partner and the partners individually were to deal directly with the government for the income tax refunds on the excessive profits refund. The defendants contend that the renegotiation refund for the partnership would be $35,000 but that the figure of $35,000 would be adjusted to preserve the income tax benefits for each of the partners. In either case the end result is the same.

At this time Palmer Johnson was confronted by a two-fold problem: First, the problem of securing the best renegotiation figure for his client, the Victory Construction Company, and second, preserving all tax benefits for each of the five partners in the Victory Construction Company.

Mr. Johnson was able to assemble data that convinced the representatives of the War Department that the $50,000 figure was too large and succeeded in having the excessive profit refund reduced to $35,000. His second task did not relate to the partnership at all, but was a duty he owed to each of the partners in preserving their tax benefits on their portion of the excessive profits refund.

Prior to the passage of the Ruml Plan Mr. Johnson and representatives of the government considered income taxes under two methods: "One would be the reduction of the renegotiation

figure by the amount of taxes on the profits," i. e., under section 3806, and "The other would be to pay the entire renegotiation figure and then attempt to recover the income taxes by way of claim against the government."

At the August meeting none of the parties was certain as to the effect of the Ruml Plan on the renegotiation contracts. For this reason the so-called final gentlemen's agreement was entered into securing to each partner his tax benefits. At that time the Army officers insisted that the partnership pay the $35,000 refund and each partner should recover his income taxes by collecting them from the Internal Revenue Department. Mr. Johnson testified: "I protested the matter of income taxes on the $35,000 and the Army insisted that each partner should recover his income taxes by collecting them from the Internal Revenue Department. I then pointed out that since we didn't know what the effect of the Ruml Plan would be, none of the partners dared sign the renegotiation agreement because none of them could be sure that they would get back their income taxes on the renegotiation refund." In preparation for this meeting Mr. Johnson had ascertained the figures on the 1942 income for each of the partners.

So at this August 10th meeting Mr. Johnson was prepared to give each of the partners information as to the tax effect on the renegotiation figure of $35,000 on their 1942 income, except for the complications resulting from the Ruml Plan. He prepared a chart running from $5,000 renegotiation figure to a $45,000 renegotiation figure showing what the net cost to the partnership would be and to each of the partners after tax benefits had been taken. This chart was given to each of the five partners. In other words, if each partner's tax benefit could be preserved for him, Mr. Johnson was prepared at the August 10th meeting to show the net cost of renegotiation for every amount from $5,000 to $45,000. For the $35,000 figure set by the Army, the net cost after tax benefits had been taken would have been approximately $13,700. This was shown to ˄ll the partners. For the $7,000 paid the War Department for

excessive profits each partner would receive tax refunds as follows: Anderson $5,200; Dudley $4,200; Humphrey $4,400; Karaffa $4,162; Pappin $3,320. Mr. Pappin paid a lesser income tax because his income was distributed to a family partnership. Therefore, for each partner's gross renegotiation share of $7,000, the actual net cost would have been for Anderson $1,818; for Pappin $3,679; for Dudley $2,800; for Humphrey $2,600; for Karaffa $2,838, or a total of $13,735 after taxes were refunded.

Thus the preservation of the tax benefits to the partners became the critical question. The result was that the figure of $35,000 was accepted subject to the gentlemen's agreement to preserve tax credits. The way the gentlemen's agreement arose was described by Mr. Johnson: ''They said they couldn't put it in writing but they would make it orally as a gentlemen's agreement that we would find out what the effect of the Ruml Plan would be as to each individual partner and that the $35,000 would be adjusted, if necessary, to whatever figure was necessary so that each partner would be in the same position after the Ruml Plan that he was in before, so that each partner would be preserved his income tax benefits under the Ruml Plan.''

At the August meeting Mr. Johnson had no information as to the partners' 1943 income. After the August meeting Mr. Johnson received a copy of I. T. 3619 and on September 2, 1943, Mr. Johnson received a proposed renegotiation agreement. Since this renegotiation agreement submitted by the Army officers did not satisfactorily protect all the partners on their income taxes, Mr. Johnson redrafted the agreement to follow the procedure under 26 U. S. C. A. sec. 3806, deducting the income taxes from the $35,000. That was not acceptable to them.

In the meantime Mr. Johnson had secured from the partners their estimate as to whether their 1943 or their 1942 income would be larger. Three of the partners, the plaintiffs here, informed Mr. Johnson that their 1942 income would be larger than their 1943. The two defendants, Anderson and Dudley, estimated that their 1943 income would be larger than their 1942. After securing this information Mr. Johnson submitted

to the Army officers another renegotiation agreement and, using $35,000 as the renegotiation cost to the partnership, he computed the amount to be paid to the government by the partnership and arrived at the sum of $26,500. His letter of transmittal explains the reason for such a reduction: "* * * it is necessary to adjust the gross renegotiation figure to $26,500.00, for this reason:

"A partnership, as such, does not pay income taxes; its net income is divided to the individual partners and they each pay the taxes. The 1943 income tax law provides, in effect, that the taxes which an individual shall pay during 1943 shall be the greater of the 1942 or 1943 income plus 25 % of the lesser.

"Three of the Victory partners, namely, Mr. Humphrey, Mr. Karaffa, and Mr. Pappin, will each have materially less income in 1943 than in 1942; each, therefore, will pay his 1942 taxes plus 25 % of his 1943. Hence, if his 1942 income is reduced (under I. T. 3619) by $7000 renegotiation refund, he will get the full tax benefit or credit on the 1942 taxes which he actually pays. As to each of these three partners, $7000, or one-fifth of $35,000, is the proper renegotiation figure under our gentlemen's agreement.

"As to the other two Victory partners, Mr. Anderson and Mr. Dudley, it is obvious at this time that their 1943 income will exceed their 1942. They will each, therefore, pay the 1943 income tax plus 25 % of the 1942, hence if the 1942 income of each is reduced by $7000 renegotiation refund (under I. T. 3619) they only realize 25 % of the tax credit that results. This certainly does not place them in the position settled upon in the gentlemen's agreement of August 10th; to place them in that position it is necessary that Mr. Anderson's gross renegotiation figure be $2237.79, and Mr. Dudley's $3303.83, making a total gross figure for the five partners of $26,541.62, or, in round figures $26,500.00, which I have used."

The agreement was approved and adopted. A check for $26,500 drawn on the Victory Construction Company account was made payable to the Treasurer of the United States; checks to

Anderson and Dudley in the amounts of $4,800 and $3,700 respectively were also drawn. The voucher on Anderson's check was as follows:

"Our Check is tendered herewith in payment of your account as follows:

"Victory Construction Co.

"Share of gross renegotiation ($35,000.00) ..................... 7,000.00
"Share of net renegotiation ($26,500.00) adjusted for
    tax credit.......................................................................... 2,200.00
"Tax credit due this partner per gentlemen's agree-
    ment on renegotiation, which cannot be realized
    under I. T. 3619............................................................... 4,800.00"

The voucher on Dudley's check was made out in the same way except that his share of the net renegotiation adjusted for tax credit was $3,300 and the tax credit due was $3,700.

The evidence does not sustain the finding of the trial court that the renegotiation refund was charged unequally against the various partners. The partnership paid $35,000 excessive profits refund and each partner bore an equal share of that. The fact that the government only received $26,500 after tax adjustment for two of the partners is immaterial. As a matter of fact, the actual return to the government after tax adjustment for all the partners was but $13,700. The difference was that the partnership on behalf of the three plaintiffs paid the entire $7,000 excessive profits and they in turn filed claims with the Bureau of Internal Revenue and were repaid by government checks. The two defendants, who under the Ruml Plan could not recover their entire income tax refund, deducted their tax refunds from the payment to the government and were repaid their income tax refunds by the two partnership checks in issue.

Had the partners individually made the payment of the excessive profits refund direct to the government, the result would have been the same. The three plaintiffs would have paid $7,000 and received income tax refunds. The two defendants who could not receive income tax refunds would have had to deduct the

refund to which they were entitled from their $7,000 payment or lose their tax benefit. Had Anderson and Dudley paid the full $7,000 it would not have changed the amount owed by the plaintiffs, but it would have meant that the defendants would lose income tax credits. The defendants would have lost but the plaintiffs would not have gained. The government would simply have collected $8,500 extra income taxes that did not need to be refunded.

This was not an alteration of the partnership agreement. The plaintiffs sought an accounting of the funds of the partnership and they received one that fully and completely explains why the checks amounting to $8,500 were drawn in favor of the defendants. The three plaintiffs are no more entitled to a share in Dudley's check for $3,700 and Anderson's check for $4,800 than the defendants are entitled to share Humphrey's refund check from the Bureau of Internal Revenue for $4,400 for a refund on the income tax he paid on this $7,000 excessive profits he received in 1942, or Karaffa's $4,162 tax refund or Pappin's $3,320 tax refund.

The judgment is reversed and the cause remanded with instructions to enter judgment for the defendants.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES BOTTOMLY and ANGSTMAN, concur.

MR. JUSTICE FREEBOURN: (dissenting).

I dissent. I believe the judgment should be affirmed.

Rehearing denied October 23, 1951.